13IN THE COURT OF CRIMINAL APPEALS OF
TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2020

## WALI MUHAMMAD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 12-00766     Carolyn Wade Blackett, Judge**

---

### No. W2019-01198-CCA-R3-PC

---

The petitioner, Wali Muhammad, appeals the denial of his petition for post-conviction relief, which petition challenged his 2017 Shelby County Criminal Court guilty-pleaded convictions of aggravated assault and aggravated robbery. In this appeal, the petitioner claims, as he did below, that he is entitled to post-conviction relief because his guilty pleas were not knowingly, voluntarily, or intelligently entered. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and J. ROSS DYER, JJ., joined.

Rosalind Elizabeth Brown, Memphis, Tennessee, for the appellant, Wali Muhammad.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Originally charged with attempted second degree murder, especially aggravated robbery, and employing a firearm during the commission of a dangerous felony, the petitioner pleaded guilty pursuant to a plea agreement with the State to aggravated assault and aggravated robbery in exchange for a total effective sentence of 12 years and the dismissal of the firearm charge. The prosecutor summarized the facts of the case:

Your Honor, had this matter proceeded to trial [the]

State's proof would be that at or around the date of August 10 of 2011 that afternoon approximately 5:45 the crime scene, the evidence would be that Mr. Jonathan E. Hill was shot in the face.

That he . . . had met with an individual on his way back to the casinos, a Mr. Sturgill. That he was in his vehicle with Mr. Sturgill, who had parked his vehicle in front of the vehicle. That there was actually a witness out in the neighborhood viewing these things.

Testimony would be that a black I believe Maxima, a black sedan or a 4-door car pulled up with tinted windows. That two individuals in dark clothing emerged from the vehicle. One with a Tech 9. That individual took a circular pattern, came around, to the driver's side, which is where Mr. Hill was seated.

That individual tapped on the window and actually ended up shooting his firearm, shooting out the tire, shooting into the vehicle. That shortly thereafter the passenger, Mr. Sturgill did leave the vehicle after unlocking the doors.

As soon as he had unlocked the doors, [the petitioner], who has been identified by the victim in this case climbed into the backseat of the vehicle, into the back passenger seat cater-corner behind or from the location of Mr. Jonathan E. Hill.

At that point, Mr. Hill's testimony would be that [the petitioner] began to produce a firearm. That he . . . had as much as $3100 on his person. The person that had just left the car told him to give him all of his stuff. The minute he saw the firearm, he jumped over the seat, puts his hands on the firearm, that the firearm was discharged traveling through his face, that he ultimately lost consciousness.

He could hear what was going on. He knows that his $3100 was taken. He was taken to the hospital. On the way to the hospital he died, lost his heartbeat in the ambulance. Somehow the EMTs were able to resurrect him and he did

-2-

regain consciousness and remarkably has recovered from a lot
of the injuries that he suffered on that day.

The petitioner timely filed a pro se petition for post-conviction relief, alleging, among other things, that he was deprived of the effective assistance of counsel. The post-conviction court appointed counsel to represent the petitioner. Following the appointment of counsel, the petitioner filed an amended petition for post-conviction relief, alleging that he was deprived of the effective assistance of counsel and that, as a result, his guilty pleas were not knowingly and voluntarily entered. In another amended petition, the petitioner added claims that the trial court coerced his pleas by threatening him with immediate incarceration should he refuse to enter the pleas and that the mishandling of his motion to withdraw his guilty pleas by both trial counsel and the trial court deprived him of the opportunity to appeal the denial of that motion.

At the March 2019 evidentiary hearing, the petitioner testified that the indictment was returned in March 2012 and that he was originally represented by a member of the public defender's office. That attorney withdrew from the case in 2015 after learning that the public defender's office also represented the victim in an unrelated case. Trial counsel was then appointed to represent the petitioner. The petitioner testified that he met with trial counsel during the time his case was pending but said that they were not "preparing for trial like what we going to do (sic) or our defense or our opening statement or nothing like preparing for trial, but we was going over what discovery the State had." He said that trial counsel told him that the accounts provided by the victim and Ms. Rucker, an independent witness, "kind of match up" and that the jury was "not going to believe" the petitioner because he was a drug dealer. The petitioner insisted that trial counsel did not prepare him to testify and that they did not discuss any potential witnesses.

The petitioner said that the case did not proceed to trial as scheduled on April 24, 2017, because trial counsel "was still trying to work out a deal." He said that he and trial counsel discussed the State's plea offer and that counsel "was telling me I would lose, and I would face up to 40 years." The petitioner insisted that he told trial counsel that he "didn't do it" and that he "didn't want to take the deal." He acknowledged that he was in court on April 25, 2017, when trial counsel told the court that the petitioner had agreed to accept the plea offer that included a sentence of "12 years at 85 percent for aggravated robbery."

The petitioner claimed that, after the April 25, 2017 proceeding, he and his mother encountered another attorney in the elevator and "spoke briefly about the case and asked him how much would he charge." He said that the attorney "gave us a price of how much he would charge, and that's when . . . I wanted to go forward with" the other

-3-

attorney. The petitioner testified that he told trial counsel that he "wanted to go forward" with another attorney and that trial counsel "said, wait. Let me see what I can do. Let me try to work things out." The petitioner conceded that trial counsel "bent over backwards trying to get the deal" but said that "the only reason I agreed to take the deal [was] because [trial counsel] wasn't ready to go to trial."

The petitioner testified that when he returned to court on May 3, 2017, he did so with new counsel and that trial counsel was not in court despite that he was still counsel of record. The petitioner said that new counsel did not become attorney of record on his case. Instead, the petitioner said, "The Judge . . . told me if I go forward with [new counsel] she would revoke my bond, make me sit in jail until trial." New counsel advised the petitioner to discuss the case with trial counsel because new counsel was "not in the position to advise" the petitioner. The petitioner testified that he ultimately pleaded guilty because he "felt like I was defeated" and that he "had no choice," explaining, "I was forced . . . to sign it, because she threatened to revoke my bond if I didn't sign it, and make me sit in jail until trial."

During cross-examination, the petitioner acknowledged that he did not pay new counsel until the day before trial but insisted that the delay was caused by his waiting for his father to send him the money. He admitted that new counsel told the trial court that he was not aware of the age of the case or that it had been previously set for trial. The petitioner conceded that new counsel confirmed trial counsel's information regarding his potential exposure but insisted that he "still wanted to go to trial knowing that I could face up to 40 years. I still wanted to go to trial to presume my innocence."

The petitioner admitted that, prior to May 3, 2017, he had not indicated a desire or ability to retain counsel. The petitioner said that his father finally agreed to help him secure retained counsel when "we seen how the case was turning," adding,

> I don't know if I can say this. I don't know if I can speak on this, Your Honor, but when I got shot, . . . when I came to the preliminary hearing about the person that shot me, [trial counsel] met with that lawyer downstairs, and that's when the suspect . . . was telling them that I sold drugs, and I had money.
>
> That's when [trial counsel] got to saying, if you've got some money I need to get paid and stuff like that. So that's when . . . I spoke with my dad letting him know what was going on with the case. He seen how the case was turning. So he was like, man, go on and hire a real lawyer.

-4-

The petitioner insisted that trial counsel, who had been appointed to his case and was being paid through the Administrative Office of the Courts, asked him for money.

The petitioner admitted that he indicated, through trial counsel, to the trial court on April 25, 2017, that he intended to enter pleas of guilty but asked the court to continue the case so that he could take care of personal business. The trial court agreed to reset the case for May 3, 2017, and, because it was set for a plea submission hearing, no jury was present. The petitioner admitted that the trial judge told him that he did not have to enter the guilty plea but warned him that if he did not do so, his bond would be revoked. He conceded that he told the trial court that no one had pressured him to enter his pleas of guilty and that he was satisfied with the services of trial counsel.

The petitioner acknowledged that trial counsel told him that trial counsel had spoken with the victim and that the victim's story matched that of the other witness. He also admitted that trial counsel told him that it was trial counsel's opinion that the victim would be a credible witness. The petitioner insisted, however, that trial counsel could have used the information gleaned from the victim to attack the victim's credibility at trial.

The petitioner denied that the reason he changed his mind about accepting the plea offer was to extend his time out of custody. He said, "It's not that I was just trying to continue this case forever and stay out. I knew one day that I would have to either go serve some time."

During redirect examination, the petitioner identified a letter that he wrote to trial counsel on May 11, 2017. In the letter, which was exhibited to the hearing, the petitioner did not express dissatisfaction with the terms of his plea agreement or with the plea process but instead stated that he "was supposed to be charged as a mitigated inmate but it seems I was charged as a Range 2 or 3." He expressed remorse for the victim's injuries as well as a desire to "get this matter settled" and offered to pay counsel "to get things right." The petitioner testified that trial counsel did not respond to the letter. The petitioner said that he then filed a pro se motion to withdraw his guilty pleas. In the motion, which was also exhibited to the hearing, the petitioner claimed that the trial court's statement that his bond would be revoked if he did not plead guilty "was one of the reasons I pleaded out." The petitioner also claimed that trial counsel performed deficiently by failing to "follow-up" on statements provided by the victim. The petitioner said that he was never notified that his motion had been denied by the trial court. The trial court's order denying the motion was exhibited to the hearing. The trial court first determined that the motion was untimely because it was filed more than 30 days after the entry of the judgment. Additionally, the court determined that the petitioner had failed to

provide any evidence to substantiate his claims regarding the voluntariness of his pleas other than his own bare assertions.

During recross-examination, the petitioner maintained that trial counsel lied to the court on April 25, 2017, when he told the court that the petitioner intended to accept the State's plea offer. He admitted that he was present when trial counsel made the assertion and that he did nothing to contradict trial counsel. The petitioner agreed that trial counsel's assertion to the court came after the petitioner and his mother had spoken to new counsel about taking over the case. The petitioner acknowledged that trial counsel told the court that he was prepared to go to trial on May 3, 2017.

Trial counsel testified that by the time he was appointed to represent the petitioner in 2015, he had represented many criminal defendants charged with criminal offenses and that he had participated in many felony trials. Trial counsel said that he reviewed with the petitioner the discovery materials that had already been provided by his previous counsel and that the petitioner "had a firm understanding of the situation." Trial counsel recalled that he discussed with the petitioner the facts of the case as well as previous counsel's strategy. Trial counsel characterized the petitioner's case as "kind of a drug deal gone wrong" and explained that his trial strategy would have been to challenge the victim's credibility. He recalled that the victim had identified the petitioner from a photographic array and that the petitioner's fingerprint had been discovered inside the victim's car. Ms. Rucker could not identify the petitioner. Another witness who had been a passenger in the car during the offenses "wobbled" but eventually tried "to place blame on" the petitioner. That witness died before the case was set for trial.

Trial counsel said that, except for a very brief period, the petitioner was out on bond the entire time that trial counsel represented him. He said that he and the petitioner met several times at trial counsel's office and had many telephone conversations about the case. He recalled that he also met with the petitioner and the petitioner's mother on at least one occasion during which they "had a lengthy discussion" regarding "how things will work at trial, the good, the bad, how things could possibly go based on certain variables." Trial counsel said that he did not make a speedy trial demand or attempt to get a quicker court date because the petitioner "was very comfortable with being out of custody" and that "anything we could do to get more time that's what he wanted to do."

Trial counsel said that his impression of the State's case changed after he spoke to the victim on April 24, 2017. Trial counsel emphasized that he was prepared to go to trial but stated that "you never know until the day of trial what the proof is actually going to be in terms of who's going to show up, what the story is today, and what's going on." Trial counsel said that, had he gone to trial, he intended to cross-examine the victim

-6-

with the victim's criminal history and "evidence of him using drugs and selling drugs." Counsel also intended to impeach the victim's credibility using his prior inconsistent statements. Trial counsel said that the prosecutor encouraged him to speak with the victim and that the victim "presented himself as a very coherent changed person." The victim admitted having used and sold drugs and told trial counsel that "this event kind of changed his life" for the better. Trial counsel recalled that the victim's "story tracked" the version of events given by Ms. Rucker. That version, he said, "contradicted what I was getting from my client." After speaking to the victim, trial counsel told the petitioner that the victim was "going to own up to anything I'm going to hit him with to kind of just take the air out of this impeachment, and his story is lining up with the fingerprints" and the statement given by Ms. Rucker.

Trial counsel testified that he pulled out all the stops in negotiating on the petitioner's behalf, using the age of the case and the death of a State's witness to the petitioner's advantage. In addition, trial counsel took advantage of the structure of the district attorney's office and his knowledge that a particular prosecutor would be out for medical leave "to try to negotiate the case with . . . a leader who I felt would be more favorable for us." He said that the petitioner's had been deemed a "no deals" case with a total potential exposure of 42 years and that he was able to negotiate a plea offer of 12 years to be served at 85 percent release eligibility and dismissal of the firearms charge, which carried a mandatory consecutive sentence and 100 percent release eligibility. Trial counsel said that he and the petitioner "were able to have meaningful discussions about the proof and how the law applied" and that the petitioner "understood and was able to kind of contribute in our discussions."

Trial counsel testified that when he told the petitioner about his reassessment of the case, the petitioner was not happy. He said that the petitioner had been out on bond for "four or five years" and that "[h]e had grown accustomed to being out." Trial counsel said that he was ready to go to trial but that he provided the petitioner "the global picture of where everything was." He told the petitioner that it was his opinion that the State had provided a "good offer given the proof" but "made abundantly clear to him that it's not my decision." Trial counsel said the petitioner eventually said that "he wanted to take the plea, and actually his mother too. She was involved in his discussions, and they both agreed that this was his . . . best move at this point." Trial counsel recalled that the petitioner told him that he had "some affairs to take care of" and said that he needed time before he was taken into custody. Trial counsel testified that based upon the petitioner's assertions, he told the trial court that the parties "have something worked out, but he needs at least a week or so whatever the reset was to get his affairs in order." He said that he would not have made such assertions to the court if he had not believed them to be true, saying, "I mean, just -- your word is what you got in that situation."

Trial counsel said that, prior to April 24, 2017, the petitioner had not mentioned retaining another attorney. Trial counsel said that he had been appointed to represent the petitioner, that he was paid via the Indigent Defense Fund, and that he never told the petitioner "or his family that the outcome would change based on money." He flatly denied asking the petitioner for payment in addition to the fees he was being paid for his appointment to the case. He added, "If there was ever any discussion about me with money, it's a yes, I'm a private lawyer. I do take private cases, and I charge fees for my work. But I also take appointed cases where I'm paid through the [c]ourt . . . ."

Trial counsel said that he was not aware when he told the trial court that a settlement had been reached that the petitioner had had discussions with new counsel. He said that after he made the assertions to the court, the petitioner "may have called me, and we may have had a discussion that he said, well, I want to back out of this." He also said that the petitioner may also have said he intended to hire new counsel and that trial counsel "may have explained to him, well, you know, this doesn't look good with the [c]ourt." Trial counsel said that he was "aware that if you play games with the [c]ourt while out of custody or if you try to cause delays," the court might revoke bond. He testified that he "would've discussed that with him either on the phone in that call or the day of court explaining that this is what can happen. . . . this is up to the [c]ourt's discretion. Don't be surprised if this occurs." He clarified that he could not recall whether he had actually spoken with the petitioner but said that if he had done so, he would have given the petitioner that information. Trial counsel reiterated that he "would have been surprised that he would be backing out after assuring me when we got the continuance that this is what he wanted to do. He was comfortable."

Trial counsel acknowledged that he was not present in court on May 3, 2017, when new counsel tried to make an appearance on the petitioner's behalf to request a trial date. Once he arrived, he and the petitioner discussed "what all had happened that morning, what's going on, what the situation is. Are we still doing this plea? Am I still your attorney? What's going on? And so we . . . cover all of that." Trial counsel recalled that the trial judge was "frustrated" with everything that had happened, particularly given counsel's prior representations to the court. Trial counsel testified that "after discussing the entire situation, [the petitioner] decided to go forward with the plea" and did not, at any point, indicate that he actually wanted to go to trial. He added, "You know, . . . we discussed the -- the situation and came to the terms that this is the plea that he wanted to enter." Trial counsel said that, if the petitioner had indicated that he wanted to go to trial and that he wanted trial counsel to remain as his attorney, trial counsel "would have tried to do what we could do to get him back out of custody." Trial counsel observed that the decision to revoke the petitioner's bond was within the discretion of the trial court and stated that the trial court "clearly did not take away his trial right. The

[c]ourt was clear from what I recall that, I'll give you a trial date. That's fine. But I'm upset that you appear to be gaming the system here to your advantage by . . . getting out of this trial date."

Trial counsel testified that "over the two years representing him," he and the petitioner "had several meaningful discussions about the case, the defense, the exposure, . . . all the normal stuff." In contrast to those discussions, on either "the trial setting or the day of the plea," for "the first time in . . . the year or two years of representing him and knowing him, he started asking questions like, what is a trial or what do you mean jury?" Trial counsel said that he "could just tell at that moment that he was being . . . disingenuous." Trial counsel added that the petitioner also had been previously subjected to voir dire by the court regarding his understanding of the case and the proceedings when he rejected the State's first plea offer. After discussing the situation with the petitioner and the petitioner's mother, trial counsel was comfortable that the petitioner wanted to accept the State's offer and plead guilty. He said that if he had any doubts about the voluntariness of the petitioner's plea, he "would not have prepared him and assisted him entering that plea."

During cross-examination, trial counsel reiterated that he was appointed to represent the petitioner in December 2015 and conceded that he filed his first motion for discovery in February 2017. He explained, however, that he filed that motion "mainly to protect the record" because he had received all of the discovery materials from the petitioner's first attorney in December 2015. Trial counsel acknowledged that he requested funds to hire a private investigative firm in January 2017, four months before the scheduled trial date, but said that he had conducted his own investigation before that and that he had received investigative materials from the petitioner's first attorney.

Trial counsel maintained that when he spoke with the victim on April 24, 2017, the victim "owned up to using drugs" and "even owned up to being in a drug transaction on that street." Trial counsel said that his "impression was [the victim] was kind of taking the wind out of my cross, that . . . instead of fighting me on it, he was kind of leaning into it." Trial counsel said that he did not ask the petitioner to be present during his interview of the victim because to do so "would be a horrible strategic move on my part." Trial counsel said that it was his "strategy to gather as much information . . . as I can prior to trial so that I can prepare and know how to respond to evidence." When asked whether he believed that speaking to the victim outside the presence of the petitioner "eroded" his ability to fairly represent the petitioner, trial counsel replied:

> That is the most bizarre idea of pretrial preparation
> I've ever heard in my experience as an attorney. So if you're
> asking me that I should not have spoken with a witness prior

to trial, I believe I should have. I believe that's my ethical duty that if I have an opportunity to gather information and evidence prior to trial for my clients potential 41-year exposure criminal case, I needed to do that.

I need to get that information and get to my client as quickly as I could and let him evaluate it. Let him decide according to his Constitutional Rights whether he decided to take his case to trial. What I think, who I believed, does not matter.

Counsel characterized his meeting with the victim as "a significant turning point in this case."[1] Trial counsel agreed that the petitioner had the constitutional right to change his mind about accepting the plea offer but stated that "there may be consequences in terms of bond and release . . . that that defendant will have to take up with the [c]ourt for their time."

Trial counsel conceded that the petitioner contacted him after entering his pleas because he "wanted to withdraw his plea," explaining that "what I gathered from that was him saying he was forced to take this plea." Counsel said that he told the petitioner that he could not file a motion to withdraw under those circumstances "because number one, that is not how I remember this plea. And number two, . . . I was a potential witness to those allegations and any allegations he would make that led toward ineffective assistance of counsel, I couldn't file on his behalf."

During redirect examination, trial counsel testified that the victim's version of events placed the petitioner at the scene with a gun in his hand and ended with the petitioner's shooting the victim in the face. Trial counsel acknowledged that the victim had a lengthy criminal record and had made inconsistent statements in the past but said that he nevertheless concluded that the victim's account, coupled with the impending testimony of the independent witness "and the fingerprints and everything and the gunshot wounds and the blood and everything else" would likely result in the petitioner's being convicted as charged. Counsel said that it was not necessarily that he personally believed the victim's version of events but that he believed that a jury would be likely to believe the victim's version. Trial counsel agreed that, with only six potential witnesses, the petitioner's case did not involve a lot of proof.

---

[1]     The petitioner made much of the fact that trial counsel spoke with the victim outside his presence, apparently misapprehending the function of the Confrontation Clause. The constitution only guarantees the right to confrontation at trial and does not constrain trial counsel's pretrial investigation. Indeed, counsel is to be commended for making the effort to interview the victim prior to trial.

The transcript of proceedings from May 3, 2017, which was exhibited to the hearing, showed that new counsel attempted to make an appearance on the petitioner's behalf, telling the court: "Yesterday [the petitioner] came by my office and left a fee that would be sufficient for me to substitute in. I didn't find that out until I came in the office this morning." The trial court noted that the case had been pending since 2011 and asked, "Didn't we have this worked out . . . ?" The prosecutor replied, "That's correct, Your Honor. . . . I bent over backwards to get a new offer . . . . But apparently he . . . doesn't want that offer I guess. I don't know." The trial judge told the petitioner that he did not owe the court "any explanation. It's just this is a case that's been -- six years." New counsel indicated that he had not spoken to trial counsel about the case, and the trial court observed that trial counsel "has done so much work on this case like he does in every case." The prosecutor stated that if the petitioner did "not take that offer today of course that offer will be revoked and we will be in a trial posture on it." New counsel asked the trial court "to hold this, let [trial counsel] come, talk to him again," explaining, "I'm not in a position to advise him what to do other than I'm available to try the case. But I'm not in a position to say if that's the best thing to do." At that point, the trial court reviewed the petitioner's case file and then the following exchange occurred:

> THE COURT: Okay. What happened was based on assurances that he was pleading guilty we didn't go forward with the trial, gave him until today to go into custody. His bond is revoked if this doesn't go forward. So that's what's going on.
>
> THE [PETITIONER]: May I speak, Your Honor?
>
> THE COURT: No.
>
> [NEW COUNSEL]: No.
>
> THE COURT: No.
>
> [NEW COUNSEL]: Wait outside for me.
>
> THE COURT: This is just playing games with the [c]ourt.
>
> [NEW COUNSEL]: Hold on, Mr. Muhammad, I'm sorry. The Judge wasn't through. That's my mistake.

THE [PETITIONER]: I didn't understand.

THE COURT: You know, this case is six years old.

THE [PETITIONER]: Yes, ma'am, Your Honor.

. . . .

THE COURT: I was told we would not go forward with the trial, the case was worked out --

THE [PETITIONER]: I didn't understand --

THE COURT: Stop.

THE [PETITIONER]: I'm sorry. I'm sorry.

. . . .

THE COURT: The case was worked out. You were pleading guilty to 12 years and going into custody today.

THE [PETITIONER]: I didn't --

THE COURT: Yes, you did understand.

THE [PETITIONER]: No, ma'am.

THE COURT: You don't want to go into custody and I -- stop. And I fully understand you don't want . . . to do 12 years jail time. I wouldn't either.

THE [PETITIONER]: No, ma'am. It's not that, Your Honor. I'm sorry.

THE COURT: Yes, it is that. Yes, it is that and I get that. I get that, but I was ready to try your case and we would let a Jury decide whether or not you were guilty of especially aggravated robbery, which carries 15 to

-12-

25 years jail time.  That's real jail time.

THE [PETITIONER]:    Yes, ma'am.

. . . .

THE COURT:    That's what that was about. Based on your assurances that you were pleading guilty I let you walk out that door.

THE [PETITIONER]:    Yes, ma'am.

THE COURT:    And now you're reneging on that.

THE [PETITIONER]:    I'm not, Your Honor.

THE COURT:    You've hired another attorney after you told me you couldn't hire an attorney and I appointed counsel.  That's been going on for six years.

So, I promise you, if you're not entering a guilty plea today and you don't have to, I will again set this for trial, which is multiple, multiple trial settings for you, not for the victim.  The victim has been ready and willing to have this case heard.

THE [PETITIONER]:    Yes, ma'am.

THE COURT:    It's not just your case to be heard, it's the victim's day in court too.  And that's my job to get this case heard and it will be heard either through a guilty plea or through a Jury trial.

THE [PETITIONER]:    Yes, ma'am.

THE COURT:    But what we're going to do right now is we're standing in recess and we're going to get [trial counsel] up here.  He's not leaving the courtroom. Stand in recess.

When the court reconvened, trial counsel appeared and told the court that he had spoken to the petitioner and the petitioner's mother and that he had been told that new counsel "was going to be coming by." Trial counsel indicated that he did not oppose the petitioner's hiring new counsel, saying, "It's his decision who he hires." The trial court responded, "Well, it is and it isn't." The trial court observed that new counsel "really doesn't know anything about the case" and that the parties had been prepared to go to trial on the previous setting. The court also observed that it had allowed the petitioner "to leave the courtroom and to return today ready to go into custody" based assurances "that the matter would be resolved on a guilty plea." The court went on:

> And if I'm incorrect, let me know. That was what was done. This case is now six years old. [Trial counsel] is the third attorney in this case. He was appointed as were the other attorneys. So this morning [new counsel] comes in and says . . . a large amount of money was brought to him recently, very recently to retain him to try the case.

> And he was ready to select a trial date and that's not what's going to happen. If it happens in any way shape or form [the petitioner] is going into custody. Because we were ready to try this case approximately one week ago. We were ready to bring the jurors into this courtroom and give [the petitioner] his Jury trial.

> So as far as I'm concerned this is reneging on a promise made to this [c]ourt that the matter was settled and [the petitioner] would go into custody. So that's this [c]ourt's position.

> Is there anything inaccurate in what I've just said?

Both trial counsel and the prosecutor agreed with the court's assessment of the status of the case. The prosecutor indicated that, after speaking with new counsel, it was his impression that new counsel did not have "any idea of the posture that this case was in, the age on this case, the amount of work that [trial counsel] has put into this case."

At that point, the trial court asked the petitioner whether he wanted "to accept the guilty plea that you agreed to or do you want a trial date?" The following exchange occurred:

THE [PETITIONER]:     I'm not sure, Your

-14-

Honor.

> THE COURT: Okay. Your bond is revoked. We'll get [new counsel] in here to get you a trial date.

> THE [PETITIONER]: I'm sorry. You didn't let me finish.

> THE COURT: I'm sorry.

> THE [PETITIONER]: You didn't let me finish, Your Honor. I'll go ahead. I'll accept the plea. If I'm going to be in jail I might as well be in jail doing my time.

> THE COURT: It's what you agreed to.

> THE [PETITIONER]: I didn't understand though. My mom tried to help me out to understand everything. But I apologize to the [c]ourt, to the State. I'm ready to go forward.

At the guilty plea submission hearing that took place later that same day, the trial court informed the petitioner that he did not have to plead guilty and had the right to a jury trial. After the trial court completed the full Rule 11 litany, the defendant indicated that he had no questions for the court, that no one had pressured or forced him to plead guilty, and that he was satisfied with the services of trial counsel.

In its written order denying post-conviction relief, the post-conviction court found that the trial court's indication "that it would revoke [the p]etitioner's bond if he decided to go to trial" did not amount to coercion but was, instead, a proper exercise of the court's "right under the law." The court noted that, based on the representations from trial counsel that the petitioner "was going to plead guilty but needed some time to get things in order," "the trial court released the jury" and set a date for the guilty plea submission hearing. When the petitioner hired new counsel and refused to enter the guilty pleas as promised, the trial court concluded that the petitioner "was 'playing games with the court'" in a manner that was "obstructing the progress of the trial" and "decided to exercise its right and revoke" the petitioner's bond to prevent further delay and ensure

-15-

the petitioner's presence.[2]

The post-conviction court concluded that trial counsel did not perform deficiently by indicating to the court that the petitioner intended to accept the State's plea offer and plead guilty because, at that time, the petitioner had indicated as much to trial counsel. The court also determined that trial counsel's initial absence from court on the day of the guilty plea hearing did not result in prejudice to the petitioner's case because the court gave the petitioner an opportunity to discuss the available alternatives with his counsel and because counsel was present when the petitioner pleaded guilty.

The post-conviction court held that the fact that the petitioner did not receive a copy of the order denying his motion to withdraw his guilty pleas would not entitle the petitioner to post-conviction relief. As to the petitioner's claim that trial counsel performed deficiently by failing to assist in the petitioner's attempt to withdraw his guilty pleas, the post-conviction court concluded that trial counsel was not obligated to assist the petitioner because he was not the petitioner's counsel when the motion was filed.

In this timely appeal, the petitioner reiterates his claim that his guilty plea was not knowingly and voluntarily entered because the trial court threatened to revoke his bond if he refused to plead guilty and because trial counsel performed deficiently by absenting himself from the court "during the time that the [p]etitioner was being coerced and threatened by the trial court" and by failing to "get detailed information regarding what happened that led to [p]etitioner's plea."

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

---

[2] Code section 40-11-414(b) provides that if "the defendant . . . engages in conduct which results in the obstruction of the orderly and expeditious progress of the trial or other proceedings, then the court may revoke and terminate the defendant's bond and order the defendant held without bail pending trial or without release during trial." T.C.A. § 40-11-141(b).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Apart from whether a guilty plea is the product of ineffective assistance of counsel, it is invalid if otherwise made unknowingly or involuntarily. "Whether a plea was knowing and voluntary is an issue of constitutional dimension because 'the due process provision of the federal constitution requires that pleas of guilty be knowing and voluntary.'" *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000) (quoting *Johnson v. State*, 834 S.W.2d 922, 923 (Tenn. 1992)). A plea "may not be the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Wilson*, 31 S.W.3d at 195 (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969)); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn.1993)).

Both claims of ineffective assistance of counsel and involuntary guilty plea are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010);

*State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record supports the denial of post-conviction relief. Although the trial court indicated an intent to revoke the petitioner's bond if he did not go forward with his promise to plead guilty on May 3, 2017, the record establishes that the trial court's decision to revoke the petitioner's bond was not based upon the petitioner's exercising his constitutional right to trial but was based upon what the trial court perceived as the petitioner's "playing games" to remain out of custody as long as possible. The trial court emphasized to the petitioner that he was not obligated to plead guilty and that the court would set his case for trial if that was his desire. Moreover, trial counsel's absence during these proceedings did not prejudice the petitioner's case because new counsel was present in the courtroom to advise the petitioner, the trial court took a recess specifically to allow the petitioner to discuss the case with trial counsel, and the court presented a full recap of the earlier proceedings on the record when trial counsel returned later in the day. Trial counsel's evidentiary hearing testimony, implicitly accredited by the post-conviction court, established that the petitioner had accepted the State's offer and was ready to plead guilty on April 25, 2017, and that, after some discussion with trial counsel on May 3, 2017, the petitioner was ready to plead guilty that day. The transcript of the guilty plea submission hearing and the other proceedings support the conclusion that the petitioner's pleas were knowingly and voluntarily entered. The petitioner has failed to establish any detail or clarification that trial counsel could have obtained that would have resulted in the petitioner's not pleading guilty.

As to the petitioner's claim, presented in his reply brief, that trial counsel performed deficiently by failing to assist the petitioner in preparing the motion to withdraw his guilty pleas, we hold that the petitioner is not entitled to post-conviction relief on this basis.[3] The petitioner, citing *Garza v. Idaho*, asserts that trial counsel's refusal to assist him in the preparation of the motion to withdraw the guilty pleas was "per se ineffective assistance of counsel." In *Garza*, the Court revisited the holding of *Roe v. Flores-Ortega* "that when an attorney's deficient performance costs a defendant an appeal that the defendant would have otherwise pursued, prejudice to the defendant should be presumed 'with no further showing from the defendant of the merits of his underlying claims.'" *Garza v. Idaho*, 139 S. Ct. 738, 742 (2019) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000)). The *Garza* majority held that the *Flores-Ortega*

---

[3] Initially, we would note that, although the petitioner claims that he filed his pro se motion in May 2017, the motion itself, which was exhibited to the hearing, indicates that it was signed by the petitioner on June 7, 2017.

presumption of prejudice should apply even in those situations where a guilty-pleading defendant has signed "an 'appeal waiver'—that is, an agreement forgoing certain, but not all, possible appellate claims." *Id.* The ruling in *Garza* is confined to counsel's duty to file the notice of appeal document when asked to do so by his client. Indeed, the Court observed that the holding "hinge[d]" on "two procedural devices . . . : appeal waivers and notices of appeal." *Garza*, 139 S. Ct. at 744. As to these two devices, the Court first determined that "while signing an appeal waiver means giving up some, many, or even most appellate claims, some claims nevertheless remain." *Id.* at 745. The Court then concluded that "filing a notice of appeal is, generally speaking, a simple, nonsubstantive act that is within the defendant's prerogative." *Id.* at 746. The case makes no mention, and therefore has no application, to the filing of the motion to withdraw a guilty plea. We observe that, unlike the filing of a notice of appeal, the filing of a motion to withdraw a guilty plea is not a simple, ministerial task and that, although an accused has a right to appeal, no such right applies to the filing of a motion to withdraw a guilty plea. Moreover, trial counsel correctly stated that he could not ethically file a motion to withdraw that had, as a basis for relief, a claim that trial counsel was ineffective. *See McCullough v. State*, 144 S.W.3d 382, 386 (Tenn. Crim. App. 2003) ( stating that "it is reasonable to anticipate that [counsel's] financial, business and/or personal interests may affect his professional judgment insofar as advising the [petitioner] about any possible ineffectiveness on his part"); *see also* Tenn. Sup. Ct. R. 8, RPC 1.7(2) ("A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer.").

    Accordingly, we affirm the judgment of the post-conviction court.

                   _____
                    JAMES CURWOOD WITT, JR., JUDGE